## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:     1:17-CV-592

KIMBERLY SCHOCK,                              )
                                             )
        Plaintiff,                           )
                                             )
v.                                           )
                                             )
PHARMACISTS MUTUAL                           )
INSURANCE COMPANY                            )
                                             )
        Defendant.                           )
                                             )

---

### CIVIL COMPLAINT AND JURY DEMAND

---

The Plaintiff, Kimberly Schock, by and through her undersigned attorneys, ZANER HARDEN LAW, LLP, hereby submits the following Civil Complaint and Jury Demand and asserts:

### JURISDICTION AND VENUE

1.      At all times relevant to this action, Plaintiff Kimberly Schock (hereinafter "Plaintiff") resided in Colorado.

2.      Upon information and belief, at all times relevant to this action, Defendant Pharmacists Mutual Insurance Company (hereinafter, "Defendant") was and is an Iowa corporation licensed to do business in the State of Colorado.

3.      At all relevant times, Defendant purposefully availed itself of the privilege of conducting business in the State of Colorado.

4.      Defendant maintains a registered agent for service in Denver Colorado: C T Corporation System, 1675 Broadway, Suite 1200, Denver, Colorado 80202.

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is a civil action in which the parties are citizens of different states.

6.      Venue is proper in the U.S. District Court for the District of Colorado pursuant to 28 U.S.C. § 1391(b) as this is a District in which a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.

## FACTUAL ALLEGATIONS

7.      On or about March 6, 2014, Plaintiff and Stuart Hyma (hereinafter, "Hyma") were involved in a motor vehicle collision at or about the 9400 Block of Interstate 70 westbound.

8.      Plaintiff was driving a 2004 Ford F-350 (hereinafter, the "Ford") and was proceeding westbound on Interstate 70, in the exit lane for Kipling Street.

9.      Hyma was driving a 2002 Chevrolet Silverado (hereinafter, the "Chevrolet") and was traveling westbound on Interstate 70, in the exit lane for Kipling Street.

10.     Hyma failed to pay attention to the traffic ahead and drove the Chevrolet into the rear of the Ford, driven by Plaintiff.

11.     When Hyma caused the Chevrolet to collide with the Ford, he drove in a careless and imprudent manner, failing to take into account the safety of others, particularly Plaintiff.

12.     Plaintiff suffered physical injuries as a result of the aforementioned collision and underwent medical treatment.

13.     Plaintiff was not comparatively negligent at the time of the collision.

14.     Plaintiff did not cause the aforementioned collision.

15.     Plaintiff was wearing a seatbelt at the time of the aforementioned collision.

16.     As a direct and proximate result of Hyma's negligence, Plaintiff incurred past and future economic expenses, losses and damages, including, but not limited to, past and future medical expenses, loss of income, and other economic losses.

17.     As a direct and proximate result of Hyma's negligence, Plaintiff suffered in the past, and will continue to suffer in the future, non-economic damages including, but not limited to, pain and suffering, loss of enjoyment of life, inconvenience, emotional stress and impairment of quality of life.

18.     As a direct and proximate result of Hyma's negligence, Plaintiff has suffered physical impairment.

### *Hyma was an Uninsured Motorist Pursuant to Plaintiff's Policy with Defendant*

19.     At the scene of the collision, Hyma produced insurance information related to a policy with Shelter Insurance Company, Policy No. 05179381187.

20.     Upon information and belief, the named insured on the Shelter policy is Gabriel Davis (hereinafter, "Davis"); Davis is the owner of Alpine Heavy Duty Repair, L.L.C. (hereinafter, "Alpine"); Alpine was Hyma's employer at the time of the crash.

21.     On March 11, 2014, Shelter sent Plaintiff a letter stating, "Shelter's investigation revealed that there is no coverage for this loss.  Because there is no coverage, we will be unable to pay for your loss."

22.     In another letter August 5, 2015, Shelter again confirmed that Shelter would not be providing any coverage for Plaintiff's loss.

23.     In a third letter dated August 27, 2015, Shelter explained that the reason why there would be no coverage for Plaintiff's losses is because "Hyma . . . is an excluded driver on policy 05-1-7938118-7."

24.     Hyma did not produce any of his own automobile insurance information.

25.      At the time of the crash, Hyma was not covered under any bodily injury automobile insurance as defined by Plaintiff's uninsured motorist coverage insurance policy (hereinafter, "the Policy") with Defendant. Nor did Hyma have a valid driver's license.

26.     Specifically, the Policy states that an "uninsured motor vehicle" is one "to which no bodily injury liability bond or policy applies at the time of the accident."

27.     The Policy also defines an "uninsured motor vehicle" as one "to which a bodily injury liability bond or policy applies at the time of the accident but the bonding or insuring company denies coverage."

28.     The only insurer who potentially could have provided bodily injury coverage on the Chevrolet being driven by Hyma, Shelter, denied coverage.

29.     The Chevrolet was an "uninsured motor vehicle" pursuant to Plaintiff's Policy with Defendant.

30.     Hyma was an uninsured motorist at the time of the aforementioned collision, maintaining no coverage necessary to compensate Plaintiff for her injuries and damages caused by Hyma's negligence.

### *Plaintiff Files Suit Against the Motor Vehicle Accident Tortfeasors and Eventually Recovers*
### *Under a "Garage" Insurance Policy*

31.     On March 3, 2016, Plaintiff filed suit in Denver County Court, 2016CV30752, against Hyma, Alpine, and Davis, alleging negligence, negligence *per se*, vicarious liability, and negligent hiring, training, retention, and supervision against the various defendants in this litigation.

32.     As litigation commenced, various insurance companies hired counsel under a reservation of rights for Hyma, Alpine, and Davis.

33.     In that litigation, it was revealed the Alpine was covered under a "garage" policy, (hereinafter, "the Garage Policy") through Farmers Insurance which covered Alpine's garage operations as well as Alpine employees while such employees were in the course and scope of their

employment with Alpine. The Garage Policy is not a bodily injury policy as contemplated by Plaintiff's insurance contract, the Policy, with Defendant.

34.    However, Alpine denied that Hyma was in the course and scope of his employment with Alpine at the time of the motor vehicle accident and therefore the Garage Policy provided no coverage for this incident.

35.    Instead, Alpine claimed that Hyma stole the Chevrolet and was driving it without Alpine's permission.

36.    The insurer for the Garage Policy, Farmers Insurance Exchange, issued a coverage opinion letter which, in part, stated that coverage would only apply if Hyma was in the course and scope of his employment with Alpine when the crash occurred.

37.    Plaintiff asserted that Hyma was, in fact, in the course and scope of his employment with Alpine when the crash occurred and presented disputed evidence that he was in the course and scope of his employment with Alpine at the time of the crash.

38.    Alpine continued to deny that Hyma was in the course and scope of his employment at the time of the crash.

39.    In December 2016, after several discovery disputes and alleged discovery violations by Davis and Alpine – including a hearing where the Court invited Plaintiff to file a motion for a variety of sanctions including striking pleadings – Farmers Insurance Exchange (the insurer of the Garage Policy) offered a settlement of $500,000.00. Alpine and Davis did <u>not</u> admit liability or that Hyma was in the course and scope of his employment with Alpine at the time of the crash.

40.    Although Plaintiff believed that consent to settle with Farmers, the insurer of the Garage Policy, was not required, since the policy was a garage policy and not a bodily injury policy, Plaintiff, in an abundance of caution, sought consent to settle with Farmers from Defendant.

41.    On December 15, 2016, Defendant's legal counsel expressly agreed that the Garage Policy is not a bodily injury policy and therefore Plaintiff did not, in fact, require consent from Defendant to settle with Farmers.

42.    Defendant also added, however, that it did not object to the proposed settlement with Farmers.

43.    Therefore, Plaintiff accepted Farmers' settlement offer and that litigation was dismissed with prejudice.

44.    Plaintiff also resolved all outstanding medical treatment subrogation interests after settling with Farmers under the Garage Policy.

45.    As discussed above, under the Policy, an "uninsured motor vehicle" is a vehicle to which "no bodily injury liability bond or policy applies at the time of the accident."

46.     The Garage Policy insured by Farmers Insurance Exchange was not a bodily injury policy and therefore Hyma was still the driver of an uninsured motor vehicle under the terms of Plaintiff's insurance contract, the Policy, with Defendant, maintaining no coverage necessary to compensate Plaintiff for her injuries and damages caused by Hyma's negligence.

### *Plaintiff Maintained $500,000.00 in Uninsured Motorist Coverage with Defendant Pursuant to Defendant's Own Admissions*

47.     At the time of the incident, Plaintiff was insured by Defendant for Uninsured Motorist Benefits (hereinafter "UM Benefits") in the amount of $500,000.00 under policy number APV0061202, the Policy.

48.     Defendant received premium payments from Plaintiff over substantial time in exchange for insurance coverage under the Policy, including UM Benefits.

49.     As an insured for UM Benefits under the Policy, Plaintiff is entitled to recover UM Benefits directly from her insurance company, Defendant, in the case that an uninsured and negligent driver, such as Hyma, injured her.

50.     Plaintiff required medical treatment as a result of the negligent driving of Hyma.

51.     Plaintiff is entitled to UM Benefits for her injuries, damages, and losses as pursuant to her contract with Defendant and C.R.S. § 10-4-609.

52.     Plaintiff's counsel sent a Letter of Representation to Defendant on March 20, 2014. Therein, Plaintiff's counsel requested "completed certified copies, including Declaration pages, of all automobile insurance policies, umbrella policies, and excess coverage policies issued to my client and/or the members of my client's household that were in effect on the above-referenced date of loss."

53.     Prior to making any formal request for UM Benefits, Plaintiff engaged in extensive communications with Defendant regarding the amount of UM Benefits available to her under the Policy.

54.     On December 18, 2014, Defendant confirmed in a telephone call to Plaintiff's office that Plaintiff's UM Benefits "stacked" as there were multiple vehicles on the Policy.  Specifically, since Plaintiff insured five vehicles with Defendant, each carrying $100,000.00 in UM Benefits, Plaintiff could "stack" the coverage available on each vehicle and therefore had $500,000.00 in UM Benefits available to her.

55.     Defendant confirmed for a second time that Plaintiff's UM Benefits stacked in a telephone call with Plaintiff's office on May 21, 2015.

56.     Defendant confirmed for a third and fourth time that Plaintiff's UM Benefits stacked during two telephone calls with Plaintiff's office on May 26, 2015.

57.     In a letter dated May 26, 2015 that memorialized these four telephone calls, Plaintiff's counsel stated that Defendant had "previously advised me on the telephone that my client, Kim

Schock, has five UIM policies that stack for a total of $500,000.00 in coverage.  I have reviewed the policies and concur with your company's coverage determination."

58.    In that May 26, 2015 letter, Plaintiff's counsel requested "confirmation of this amount of coverage in writing."

59.    In a letter dated May 26, 2015, Defendant memorialized these multiple discussions that Plaintiff's UM Benefits stacked in written correspondence to Plaintiff:

Date: 5/26/2015   Time: 3:35 PM   To: 37595,37905,24690479 @ 13035635351
                   Page: 001



- Pharmacists Mutual Insurance Company
- Pharmacists Life Insurance Company
- PMC Advantage Insurance Services, Inc.

To:        Jenny - Zaner Harden Law

Fax #:     13035635351

Sender:    Linda Echevarria

Phone#:    1-800-247-5930  ext. 7354

Fax #:     515-295-4321

Date:      5/26/2015

Time:      3:34 PM

Pages:     5

Subject: Kim Schock, Claim 10134194

Notes:  Attached is a copy of the estimate of damage for Ms. Schock's vehicle.  Also be advised
that we have determined stacking of her UM/UIM limits is allowed as we had discussed
previously.  Thank you.

60.    Plaintiff relied on these multiple verbal and written confirmations regarding the amount of available UM Benefits in seeking medical treatment for injuries she sustained in the crash, as well as funding for that treatment.

61.     Had Defendant informed Plaintiff that there was only $100,000.00 in coverage, Plaintiff would have settled her claim at this time. She would not have financed several hundred thousands of dollars of treatment with a medical finance company.

62.     However, based on this representation, Plaintiff utilized a medical finance company to fund her treatment to see the world-renowned neurosurgeon Chad Prusmack, M.D. Plaintiff incurred hundreds of thousands of dollars of debt based on this representation.

**Plaintiff's Request for UM Benefits**

63.     On January 20, 2016, Plaintiff made a request to Defendant for UM Benefits. Specifically, Plaintiff requested the "full policy limits of $500,000.00."

64.     Plaintiff attached extensive medical records from ten (10) medical care providers to her request, including records and bills from: Panorama Orthopedics, Panorama Physical Therapy, Golden Ridge Surgery Center, Rocky Mountain Spine Clinic, Bennett Mechanic, M.D., Surgery Center at Dry Creek, and A. Fox Physical Therapy.

65.     Further, in addition to including a computation of her past and future medical bills (which were, at the time, $217,618.94 and $12,167.00, respectively) Plaintiff explained to Defendant the catastrophic effect the crash had upon her life.

66.     Plaintiff informed Defendant "following the collision, [Plaintiff] experienced difficulty with all types of physical activity and severe limitations performing her professional job."

67.     Plaintiff informed Defendant that while she was once a "healthy, active woman with no relevant medical history," since the crash "her life is now completely unrecognizable to her."

68.     Plaintiff told Defendant about her "excruciating pain and numbness" in her hand, "daily headaches, and difficulty with walking and balance."

69.     Plaintiff explained to Defendant that the crash had severe impacts on her "life and responsibilities as a wife, mother, grandmother, and homemaker," as she was unable to perform the most basic household tasks or enjoy once-loving relationships with her husband and grandchild.

70.     On February 18, 2016, nearly **one month** after sending Defendant her request for UM Benefits, Defendant informed Plaintiff that it had retained attorney Peter Doherty, Esq. (who has now been replaced by other counsel) to "take a look at the file."

71.     In this same communication of February 18, 2016, Defendant stated that it was still getting a "better understanding of [Plaintiff's] *alleged* injuries resulting from this accident" (emphasis added).

72.     Defendant did not present any sort of timeline as to when Defendant would be providing a response to Plaintiff's request for UM Benefits, despite hiring outside counsel and having all of Plaintiff's medical records at its disposal.

73.     On March 2, 2016, **more than two weeks** after first hiring outside counsel, Defendant requested additional medical records and authorizations from Plaintiff.

74.     In a separate correspondence from March 2, 2016, Defendant asserted four different reasons from Plaintiff's prior medical records as alleged reasons why Defendant could not "respond to the current demand."

75.     Some of the conditions Defendant cited included conditions and injuries unrelated to the crash of March 6, 2014, including "heart burn" and "indigestion."

76.     The most recent medical record cited by Defendant in support of its argument that additional time was needed to evaluate Plaintiff's request was from June 4, 2012, nearly two years before the crash of March 6, 2014.

77.     On March 21, 2016, Plaintiff's counsel wrote to Defendant, requesting an update on how the evaluation of Plaintiff's claim was proceeding.

78.     On March 21, 2016, in response to Plaintiff's correspondence, Defendant explained that there had been a two-week delay in evaluating the claim because Defendant had hired "a local neurologist to assist with the review of the medical records" who was booked up since being retained by Defendant.

79.     Defendant failed to inform Plaintiff that it had retained outside medical professionals – or that this counsel would delay the evaluation of Plaintiff's claim by at least another two weeks – until being asked by Plaintiff's counsel.

80.     Defendant promised to provide "an estimate as to a time frame" in that same March 21, 2016 correspondence when Defendant would be able to respond to Plaintiff's claim for UM benefits.

81.     Defendant never provided this promised timeline of when it expected to be done evaluating Plaintiff's request for UM benefits.

82.     On April 13, 2016, Plaintiff's counsel requested another update on Defendant's evaluation of Plaintiff's claim.

83.     On April 14, 2016, Defendant informed Plaintiff that it had received medical records from various medical providers (Golden Ridge Surgery Center, Panorama Orthopedics, Rocky Mountain Spine Clinic, Surgery Center on Dry Creek, and Colorado Rehabilitation & Occupational Medicine), all of which had been previously sent to Defendant by Plaintiff.

84.     Defendant stated that it was still either "missing" or "waiting on" additional medical records.

85.     The medical records Defendant stated it was still "missing" or "waiting on" had already been sent to Defendant by Plaintiff on January 20, 2016.

86.    On April 19, 2016, Plaintiff's counsel informed Defendant that besides records for a single visit to Panorama Orthopedics, "these records appear complete."  Plaintiff agreed to sign an additional release form for this Panorama Orthopedics record.

87.    On May 6, 2016, Defendant notified Plaintiff that it was still "waiting on records" from three additional medical care providers.

88.    All of these records referenced in Defendant's May 6, 2016 correspondence had already been sent to Defendant by Plaintiff on January 20, 2016.

89.    On May 11, 2016, Plaintiff informed Defendant that all of the medical records which Defendant claimed to be missing had "already been provided" to Defendant more than "three months ago."

90.    In this correspondence, Plaintiff pointed out to Defendant that the only reasons why Defendant would be re-requesting records already sent to it by Plaintiff was because (1) Defendant was unreasonably delaying Plaintiff's claim; or (2) Defendant believed that, despite providing these medical records free from any redactions, Plaintiff had "surreptitiously removed individual records."

91.    Therein, Plaintiff reminded Defendant that despite receiving a Letter of Representation from Plaintiff's counsel on March 20, 2014, Defendant had taken no steps to begin evaluating her claim at that time, such as ordering her records.

92.    Similarly, Plaintiff reminded Defendant of its duties under Colorado law to (1) forward payment for undisputed medical bills; and (2) treat Plaintiff and her claim in good faith given the "special nature" of the relationship between Plaintiff and her own insurer, Defendant.

93.    On May 17, 2016, counsel for Defendant informed Plaintiff that Defendant would be reaching out to Plaintiff's counsel regarding the letter from Plaintiff dated May 11, 2016.

94.    On May 19, 2016, Defendant informed Plaintiff that it still had not received records from another medical care provider, Kaiser Permanente.

95.    On May 19, 2016, Plaintiff's counsel informed Defendant that, again, all these records had been provided to Defendant "four months ago."

96.    In that same correspondence, Plaintiff also requested an update as to when Defendant had sent in its own requests for these medical records.

97.    Plaintiff's counsel further stated to Defendant that in order "to speed things up," Plaintiff would send Defendant "the very same records" that Defendant said it was still missing.

98.    Plaintiff sent Defendant the records the same day as Defendant's correspondence, May 19, 2016.

***Defendant's Denial of Benefits and Agreement that $500,000.00 in Coverage Existed***

99.    On May 19, 2016, Defendant provided Plaintiff with an initial offer of $283,000.00. Defendant explained that "[t]his amount is inclusive of the $217.618.94 in medical presented to us in your January 20, 2016 demand, for which we would like to forward payment, regardless of whether we have a global settlement at this time."

100.    In a phone call, Defendant's Claims Examiner Melissa Divis stated that the doctor who performed Defendant's independent medical records review confirmed that *all* of Plaintiff's submitted treatment was in fact related to the crash.

101.    The remaining $65,381.06 presumably accounted for Plaintiff's pain and suffering.

102.    Despite offering to forward payment for Plaintiff's medical bills, Defendant asserted without specific reference to any medical records that some of Plaintiff's injuries were "preexisting."

103.    Defendant also admitted that many of the "records obtained by release are largely duplicates."

104.    On May 20, 2016, Defendant's counsel sent Plaintiff a bullet-pointed letter outlining its timeline of when various medical records had been requested and received, as well as explaining which records Defendant was still missing.

105.    On May 27, 2016 in response to Defendant's correspondence and offer of May 19, 2016, Plaintiff agreed to accept $217,618.94 as "payment of non-disputed medical bills," but that in accepting this amount Plaintiff and Defendant "by no means [had] a full settlement."

106.    In this correspondence, Plaintiff pointed out that even in offering $283,000.00, Defendant still took this opportunity to "challenge [Plaintiff's] damages" instead of "showing any compassion for what your own insured has gone through the past two difficult years (and all of the future pain and suffering she will endure)."

107.    In Plaintiff's correspondence of May 27, 2016, Plaintiff also addressed Defendant's letter of May 20, 2016.  Specifically, Plaintiff stated that while she appreciated the detail of this letter, Defendant had failed to address the underlying issue of why Defendant was re-requesting the exact same medical records which had already been provided by Plaintiff.

108.    Despite the duplicative nature of Defendant's actions, Plaintiff reminded Defendant that she had always promptly complied with Defendant's requests for medical records release authorizations.

109.    On June 2, 2016, Defendant confirmed receipt of Plaintiff's May 27, 2016 letter but stated that it was requesting additional records from Dr. Chad Prusmack's office.

110.    On June 2, 2016, Plaintiff agreed to forward Defendant copies of these records that Defendant stated it was missing.

111.    In that correspondence, Plaintiff informed that despite agreeing to send Defendant these missing records, such records "are not necessary to evaluate [Plaintiff's] damages which are in excess of her policy benefits."

112.    Later on June 2, 2016, Plaintiff's counsel informed Defendant that Defendant's "constant delaying by requesting records you already have or don't need to make a fair evaluation is causing your insured [Plaintiff] significant and unnecessary stress."

113.    Plaintiff's counsel reminded Defendant that the independent medical evaluation of Plaintiff's medical records "confirmed all of [Plaintiff's] medical treatment is related."

114.    In a separate correspondence on June 2, 2016, Plaintiff forwarded Defendant medical records indicating that Dr. Prusmack would be performing another fusion surgery, this time of Plaintiff's lumbar spine.  This fusion would cost more than one hundred thousand dollars and would subject Plaintiff to further pain and suffering.

115.    During the course of these negotiations, Defendant agreed, both implicitly and explicitly, that the coverage available was, in fact, $500,000.00.

### Defendant Reverses its Consistent Position of the Past Eighteen Months

116.    On June 8, 2016, Defendant informed Plaintiff that, despite oral and written confirmation and **six months** of negotiation based upon $500,000.00 in available UM coverage, "it has been determined that the UM is *not* subject to stacking[.]"  (Emphasis added).

117.    Within this self-serving proclamation, Defendant stated, "In light of our recent coverage analysis, we are withdrawing our previous settlement offer of $283,000 and will tender the UM limit of $100,000.00."

118.    Defendant also stated in the June 8, 2016 correspondence that Plaintiff would be required to execute a release.

119.    Plaintiff responded to Defendant's letter of June 8, 2016 on that same day.

120.    In her letter of June 8, 2016, Plaintiff stated that Defendant's "cursory e-mail comes well over two years since [Defendant] has been aware of [Plaintiff's] UM claim, and, more importantly, *expressly* contravenes a facsimile we received . . . on May 26, 2015" which confirmed that that the Policy does, in fact, stack.

121.    Plaintiff reminded Defendant that not only did Defendant confirm stacking in writing, but also that the letter memorialized several discussions in which Defendant stated that Plaintiff's Policy stacked.

122.    Plaintiff stated that she detrimentally relied upon Defendant's representation regarding stacking in seeking medical treatment in excess of $100,000.00.

123.    Defendant also relied upon its own representation regarding stacking, as it had offered approximately $217,000 in medical bills and $283,000 in a global settlement, both of which are in excess of $100,000.00.

124.    Defendant's statement that only $100,000.00 in coverage existed under the Policy caused and continues to cause Plaintiff fear, anxiety, stress, and uncertainty that she will be personally liable for hundreds of thousands of dollars in medical care, and will be uncompensated for the multitude of pain and suffering she has endured since the crash.

125.    In her letter of June 8, 2016, Plaintiff expressed surprise that "when it's time to finally pay her [UM] benefits, [Defendant] reversed course and, to its own benefit, decides that the policy is only worth $100,000.00."

126.    On June 10, 2016, Defendant called Plaintiff's counsel to apologize for the "mistake" that Defendant had made.

127.    Defendant attempted to shift the blame for this mistake to its own Claims Examiner, Linda Echevarria, the first adjuster assigned to Plaintiff's claim with Defendant, by claiming that the decision on stacking "was above her pay grade."

128.    At no time was Ms. Echevarria acting outside the course and scope of her employment with Defendant when she assured Plaintiff on half a dozen occasions that the policies did, in fact, stack.

129.    Despite having notice of the claim for years, and underwriting the Policy for even longer, Defendant did not take the position that, until only one week prior to June 10, 2016, the Policy was non-stacking in nature.

130.    Additionally, Defendant informed Plaintiff's counsel that it was retaining *additional* counsel to evaluate numerous potential claims for relief set forth in Plaintiff's letter of June 8, 2016. Taking an adversarial position, Defendant stated that it "was not worried" about defeating any of these claims "besides the estoppel claim."

131.    On June 13, 2016, Plaintiff sent Defendant correspondence that memorialized the conversation of June 10, 2016.

132.    Plaintiff expressed disappointment that Defendant was delaying evaluation of her claim by claiming that a key claim manager was "on a fishing trip," since Defendant had all the information it needed to make its decision nearly six months prior.

133.    Plaintiff asserted that Defendant was "taking a directly adversarial position to its insured" by actively seeking multiple ways to "defeat its insured's claim."

134.    Defendant opted to expend further time and money on hiring additional counsel to evaluate its legal exposure in stating that the Policy was non-stacking after initially represented that the Policy stacked.

135.    On June 15, 2016, Defendant informed Plaintiff that Defendant would be standing by its determination that only $100,000.00 in UM coverage was available to Plaintiff.

***Defendant's Inconsistent Behavior Continues***

136.     Despite stating that only $100,000.00 in UM coverage existed, Defendant still offered Plaintiff $217,618.94 due to Defendant's "error."  These inconsistent positions serve as tacit acknowledgment by Defendant that it was continuing to act in bad faith.

137.     On June 23, 2016, Defendant sent Plaintiff correspondence explaining again that while "the correct limit of available UIM coverage purchased by [Plaintiff] totals only $100,000," Defendant would be sending Plaintiff a total of $217,618.94 for "expenses that *appear* to be reasonably related to the motor vehicle accident."  (Emphasis added).

138.     In this June 23, 2016 correspondence, Defendant admitted that "a mistake was made in 2015 when Pharmacists Mutual conveyed information that the coverages are stacked to total $500,000.00."

139.     In response to this correspondence, on June 23, 2016, Plaintiff agreed to accept $217,618.94 being tendered by Defendant, but clarified that this amount was only "as a partial payment for her medical bills and by no means in exchange for any kind of waiver."

140.     In an e-mail from Plaintiff sent that same day, June 23, 2016, Plaintiff stated her counsel's position has "always remained the same – that there is [$500,000.00] in coverage."

141.     Plaintiff further asserted that the payment of approximately $217,000.00 in undisputed medical bills was "only a small fraction of what her damages actually are."

## FIRST CLAIM FOR RELIEF
### Uninsured/Underinsured Motorist Benefits

142.     Plaintiff incorporates herein by this reference, the allegations contained in Paragraphs 1 through 141 of this Complaint, as if set forth *verbatim*.

143.     At the time of the aforementioned collision, the Plaintiff qualified as an "insured" for purposes of a contract of insurance, the Policy, with Defendant.

144.     The Policy included a provision for uninsured/underinsured motorist bodily injury coverage, which provides that Defendant will pay for damages and bodily injuries sustained by Plaintiff if injured by a negligent uninsured driver.

145.     Hyma was a negligent uninsured/underinsured driver for purposes of UM Benefits owed to Plaintiff under the terms of the Policy and the Chevrolet he was driving was an uninsured vehicle.

146.     Plaintiff has satisfied all conditions precedent under the Policy and she is eligible to recover UM/UIM benefits under the Policy.

147.     Defendant is liable for Plaintiffs' injuries and damages, as described above, caused by the uninsured driver in accordance with the provisions of C.R.S. § 10-4-609.

## SECOND CLAIM FOR RELIEF
### Breach of Contract

13

148.    Plaintiff incorporates herein by this reference, the allegations contained in Paragraphs 1 through 147 of this Complaint, as if set forth *verbatim*.

149.    The Policy was in full force and effect on the date and time that Plaintiff suffered injuries in the aforementioned collision.

150.    Defendant unreasonably failed to pay Plaintiff's claims that were made pursuant to the applicable Policy.

151.    Defendant breached its contractual duty owed Plaintiff.

152.    Plaintiff is entitled to damages allowed by law for breach of contract against Defendant.

**THIRD CLAIM FOR RELIEF**
**Unreasonable Delay/Denial of a Claim for Benefits**
**Pursuant to C.R.S. §§ 10-3-1115-1116**

153.    Plaintiff incorporates herein by this reference the allegations contained in Paragraphs 1 through 152 of this Complaint as if set forth *verbatim*.

154.    Defendant unreasonably delayed the evaluation of Plaintiff's request for benefits, in violation of C.R.S. §§ 10-3-1115 and 10-3-1116, in various ways as set forth above, including, *but not limited to*:

    a.  repeatedly stalling and requesting medical records it already had in its possession;

    b.  requesting medical records over the course of several months instead of requesting all relevant medical records at one time;

    c.  continuing to refuse to tender the full $500,000.00 in benefits that Defendant assured Plaintiff existed;

    d.  stating that it could not respond to Plaintiff's request for UM Benefits because one of its "managers is on a fishing trip";

    e.  hiring medical counsel to review Plaintiff's medical records without informing Plaintiff that it was doing so, and then failing to inform Plaintiff that Defendant's retention of medical counsel would further delay its evaluation of Plaintiff's claim by many weeks; and,

    f.  taking more than six months after it first received Plaintiff's request for UM benefits to make a final offer of settlement.

155.    Despite the fact the physician who Defendant hired to perform an Independent Medical Record Review confirmed that all of Plaintiff's treatment was related to the crash, reasonable, and caused by the crash, Defendant ultimately offered Plaintiff zero dollars for any of her pain and suffering or physical impairment that she was entitled to under the law.  Thus, because of this and other reasons, Defendant unreasonably denied Plaintiff's claim for benefits in violation of C.R.S. §§ 10-3-1115 and 10-3-1116 when it denied and failed to settle Plaintiff's claims for benefits by refusing to tender the full $500,000.00 in UM Benefits that Defendant assured Plaintiff existed.

156.    Pursuant to C.R.S. § 10-3-1116, Plaintiff is entitled to recover the covered benefit plus twice the covered benefit as well as attorney fees and costs from Defendant for the unreasonable delay and denial of her claim for uninsured motorist benefits.

## FOURTH CLAIM FOR RELIEF
### Bad Faith

157.    Plaintiff incorporates herein by this reference the allegations contained in Paragraphs 1 through 156 of this Complaint as if set forth *verbatim*.

158.    Defendant owed Plaintiff a duty of good faith and fair dealing.

159.    Defendant's actions as set forth above amounted to bad faith and unreasonable conduct under Colorado law and Defendant knew its actions were unreasonable and/or recklessly disregarded the fact that its actions were unreasonable.

160.    Defendant breached its duty of good faith and fair dealing, its covenant to act in good faith with regard to Plaintiff, and acted unreasonably in, as stated above, the following ways, including, *but not limited to*:

    a.  taking an adversarial position to its insured;

    b.  at the time it believed there was $500,000.00 in coverage, only offering $283,000.00 in benefits;

    c.  implicitly accusing its own insured of hiding medical records;

    d.  repeatedly re-requesting records Defendant already had in its possession;

    e.  spreading its requests for various requests for medical records over several months instead of making a single, prompt request for all relevant medical records;

    f.  looking for myriad ways to avoid paying its insured the $500,000.00 in UM Benefits that Defendant assured Plaintiff existed for over eighteen months (such as looking vigorously in her own medical records for any reason not to pay, minimizing her pain and suffering, and discounting the surgical recommendation of her treating surgeon for a lumbar fusion);

    g.  changing its own coverage determination, to its own benefit, eighteen months after repeatedly telling Plaintiff there was $500,000.00 in coverage;

    h.  retaining numerous attorneys and coverage counsel to find justification for changing its coverage analysis;

    i.  waiting until after Plaintiff had incurred hundreds of thousands of dollars in personal debt related to additional medical treatment before changing its coverage analysis;

    j.  sending Plaintiff and Plaintiff's attorneys a check and settlement release before Plaintiff had even agreed to accept a settlement from Defendant or sign a release;

    k.  admitting that it had made "an error" and "a mistake" but failing to take any substantive responsibility for the error in its coverage analysis, such as standing by its initial determination; and

    l.  attempting to relate Plaintiff's injuries as a result of the crash to prior incidents or pre-existing injuries without any specificity to what those prior incidents or injuries might be.

161.    As a direct and proximate result of Defendant's unreasonable actions, Plaintiff has suffered and will continue to suffer economic and non-economic damages as described above.

**WHEREFORE,** the Plaintiff, Kimberly Schock, prays for judgment against Defendant Pharmacists Mutual Insurance Company, in an amount to be determined by the trier of fact for her losses as set forth above and for costs, expert witness fees, filing fees, pre- and post-judgment interest, and such other further relief as the Court deem appropriate, just, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. Pro. 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: March 6, 2017

Respectfully submitted,

ZANER HARDEN LAW, LLP

/S/ Kurt Zaner
Kurt Zaner, Esq. #40989
Elliot Singer, Esq. #47490
1610 Wynkoop Street, Suite 120
Denver, CO 80202
Phone: (303) 563-5354
Fax:     (303) 563-5351
E-mail: kz@zanerhardenlaw.com
         es@zanerhardenlaw.com

Plaintiff's Address:

11485 West Kentucky Drive
Lakewood, Colorado 80226